AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>MacBook Air Computer, Serial Number:<br>C1MTC3U3H3QD located at 10385 Vista Sorrento<br>Parkway, San Diego, California | )<br>)<br>)  Case No.  '24  MJ3031<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❑ contraband, fruits of crime, or other items illegally possessed;
- ❑ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC 952, 960, and 963 | Importation of Controlled Substances and Conspiracy to do the Same |

The application is based on these facts:

See attached affidavit

- ❑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Sylvan Strohm*

*Applicant's  signature*

Sylvan Strohm, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:  _____Aug. 7, 2024_____

*Daniel E. Butcher*

*Judge's signature*

City and state:  _____San Diego, CA_____                Hon. Daniel E. Butcher, US Magistrate Judge

*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

The following property is to be searched:

Macbook Air Laptop bearing Serial Number C1MTC3U3H3QD (**Target Device**)





**Target Device** is currently in the possession of the Federal Bureau of Investigation located at 10385 Vista Sorrento Parkway, San Diego, California 92121.

1

## ATTACHMENT B

### Particular Things to be Seized

Authorization to search the computer described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the device for evidence described below.  The seizure and search of the computer shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the computer will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 22, 2023 to July 25, 2024:

      a)    tending to indicate involvement or coordination in drug smuggling or related criminal activity, such as bribery of public officials, or efforts to share sensitive law enforcement information used in furtherance of any other illegal activities;

      b)    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the coordination of drug smuggling or related criminal activity, such as bribery of public officials, or efforts to share sensitive law enforcement information used in furtherance of any other illegal activities;

      c)    tending to identify co-conspirators, criminal associates, or others involved in drug smuggling or related criminal activity, such as bribery of public officials;

      d)    tending to identify assets including cash, cryptocurrency, real estate, jewelry, investments, or any other item of value possibly representing proceeds of drug smuggling or related criminal activity, such as bribery of public officials, or any other illegal activities;

      e)    tending to identify travel to or presence at locations involved in drug smuggling or related criminal activity, such as bribery of public officials;

2

f)     tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

g)     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above, which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence of the Target Offenses. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

All of the above constituting evidence of a violation of the Target Offenses.

**AFFIDAVIT**

I, Special Agent Sylvan Strohm, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I submit this affidavit in support of an application for a warrant to search the following electronic device:

MacBook Air Computer, Serial Number: C1MTC3U3H3QD (**Target Device**) as further described in Attachment A, and to seize evidence of crimes, specifically importation of federally controlled substances and conspiracy related thereto, in violation of Title 21, United States Code, Sections 952, 960, and 963, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Department of Homeland Security (DHS), U.S. Customs and Border Protection Officer (CBPO) Diego BONILLO. The **Target Device** is currently in the custody of the Federal Bureau of Investigation (FBI) located at 11385 Sorrento Valley Parkway, San Diego, California 92121.

2.     The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues experienced in the area of controlled substance investigations. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the applications for the search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation. Dates, times, and amounts are approximate.

**BACKGROUND**

3.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June of 2022. I am currently assigned to the San Diego Field

1

Office and have been assigned to investigate public corruption and border corruption cases as a member of the Border Corruption Task Force (BCTF). I am charged with investigating allegations of corrupt federal, state, and local public officials that engage in criminal activity for profit, power, as well as those criminal associates who bribe and conspire with any corrupt federal, state, or local public officials. I have received training in all criminal violations investigated by the FBI and have received additional training in public corruption and border corruption. Prior to my employment as a Special Agent with the FBI, I was employed as an Intelligence Analyst with the FBI.

4.     I have investigated aspects of public and border corruption, including bribery, drug trafficking, and human trafficking. I have participated in investigations involving the use of computers and other electronic devices to enable communication, research, and record keeping amongst co-conspirators. I have experience involving a variety of investigative techniques including interviewing informants, witnesses, and investigative targets; executing physical and digital search warrants; conducting mobile and stationary surveillance; conducting telephone toll analysis; and monitoring Title III wire-intercepts. From my training and experience, I have become familiar with the techniques and methods utilized by corrupt federal, state, or local public officials and their co-conspirators. In addition to the above stated experience, I have also worked and consulted with numerous federal agents and other law enforcement officers who have investigated public corruption, border corruption, prison corruption, drug and weapon trafficking, and alien smuggling throughout the United States, including Southern California.

5.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that computers store data including, but not limited to browsing history, passwords, communications, contact information, photographs, and documentary records. These records are often retained for years or longer, and sometimes despite the device owner attempting to delete such data.

## FACTS SUPPORTING PROBABLE CAUSE

**A.     Background**

6.     On May 3, 2024, a grand jury returned a sealed Indictment charging eleven counts of drug trafficking activity against BONILLO, CBPO Jesse Clark Garcia (GARCIA), and one other individual. The charges included conspiracy to import controlled substances, in violation of Title 21, United States Code, Sections 952, 960, and 963; multiple counts of importation of controlled substances, in violation of Title 21, United States Code, Sections 952 and 960; aiding and abetting, in violation of Title 18, United States Code, Section 2; *Pinkerton* liability; and criminal forfeiture. BONILLO was arrested on May 4, 2024.

7.     BONILLO's arrest stemmed from a long-term investigation by the FBI BCTF, with assistance from the Drug Enforcement Administration (DEA). BONILLO and GARCIA worked with a Mexico-based poly-drug distribution Drug Trafficking Organization (DTO) to ensure that the DTO's drug vehicle loads were admitted into the United States without inspection at the Otay Mesa and Tecate, California Ports of Entry (POE).

8.     As CBPOs, BONILLO and GARCIA were randomly assigned to various locations throughout their respective POEs in one-hour shifts. Their schedules were posted daily. The randomness of the shifts, the limited duration of the assignments, and the timing of the scheduling were all efforts by CBP to mitigate threats posed by unidentified corrupt CBPOs. Nevertheless, the investigation reflected that BONILLO and GARCIA shared their duty assignments with the DTO, including the times they were assigned to the primary vehicle lanes and the specific lanes under their respective control, so the drivers of load vehicles could enter into the United States with their assistance free from inspection.

9.     To date, investigators have identified at least five drug seizures associated with BONILLO and GARCIA; some of which are discussed below.

**B.    Arquimides Jesus De Los Santos Rabiela and Nayeli Viridriana Servin Vega**

10.    On February 6, 2024, at 12:54 p.m., Nayeli Viridriana Servin Vega (SERVIN) entered the United States from Mexico at the Tecate POE in a Honda Odyssey bearing California license plates. Records from the POE reflect that GARCIA was assigned to work the primary vehicle lanes from 12:00 p.m. to 1:00 p.m. They also reflect that SERVIN was admitted by GARCIA despite there being an Automatic Referral for "High Risk Narcotics/Currency Smuggling" on the Odyssey. GARCIA subsequently told POE staff that he had received the alert late, which resulted in him admitting the Odyssey. However, an audit of GARCIA's computer revealed that the Automatic Referral was received approximately 55 seconds before he admitted the Odyssey.

11.    SERVIN was admitted into the United States and undercover officers surveilled her until a traffic stop was conducted on her in Chula Vista, California. A K-9 alerted to the Odyssey, and a total of approximately 130 packages of methamphetamine, weighing approximately 58.87 kilograms, were found concealed inside a non-factory compartment located in the Odyssey's floorboard. A sample of the substance tested positive for methamphetamine. SERVIN was arrested as a result.

12.    In addition to coordinated crossings through lanes manned by GARCIA, crossing records of SERVIN reflect that she also coordinated her crossings to be admitted at times by BONILLO. For example, before crossing through the Tecate POE (where GARCIA worked), Servin crossed 32[1] times through the Otay Mesa POE vehicle lanes. Five of those crossings were through BONILLO's lane, which strongly indicates a coordinated effort. Indeed, the remaining 27 crossings were through lanes operated by 25 *separate* CBPOs. Moreover, telephone evidence suggests that she was transporting drugs and in contact with known co-conspirators on dates she crossed through BONILLO's lanes,

---

[1]    TECs records are searchable via name. Investigators recently discovered a variation of Servin's name under which additional vehicle crossings through the Otay Mesa POE were uncovered.

and not at other times she crossed through the Otay Mesa POE. For example, on November 25, 2023, SERVIN entered the United States from Mexico at the Otay Mesa POE through a vehicle lane manned by BONILLO. Hours later, she took a picture of the Fusion Ultra Lounge located in Anaheim, California, where it appears she had been directed to deliver the drug load. Indeed, on February 10, 2024, DEA investigators in Los Angeles executed a search warrant at the Fusion Ultra Lounge and seized approximately 225 pounds of methamphetamine, one kilogram of cocaine, and 10,000 fentanyl pills.

13.     Similarly, on December 14, 2023, after SERVIN entered the United States from Mexico at the Otay Mesa POE through BONILLO's lane, telephone evidence reflects that she had the following WhatsApp exchange with a co-conspirator:

SERVIN:            I'm about to get to San Clemente (audio message)

SERVIN:            I just passed secondary checkpoint

Co-Conspirator:   Were they there

SERVIN:            No, closed. Do you have an address yet?

14.     Investigators are aware that there is a checkpoint located near San Clemente, California. Investigators are further aware that the operational status of checkpoints is often of concern to drug traffickers because vehicles carrying drugs may be identified by law enforcement officers or K-9s working at the checkpoints. As such, investigators believe, based on training and experience, that SERVIN had imported federally controlled substances on this date. Further bolstering the belief that a coordinated drug smuggling event took place on December 13, 2023, is the fact that two minutes before SERVIN was admitted into the United States by BONILLO, BONILLO also admitted Luis Francisco Gonzalez-Montenegro (GONZALEZ), who is discussed below, and, less than 20 minutes after SERVIN was admitted, BONILLO also admitted Arquimides Jesus De Los Santos Rabiela[2] (RABIELA). RABIELA, like SERVIN, was also arrested on February 6, 2024,

---

[2]     On the date of RABIELA's arrest, Gonzalez also crossed immediately behind RABIELA through GARCIA's lane and then traveled in tandem with RABIELA until

shortly after crossing through GARCIA's lane at the Tecate POE. His vehicle was found to contain approximately 32.35 kilograms of fentanyl, 37.1 kilograms of methamphetamine, and 54.6 kilograms of cocaine.

**C.    Luis Francisco Gonzalez-Montenegro and Others**

15.    On February 15, 2024, a CBPO working pre-primary at the Otay Mesa POE inspected a Buick LaCrosse being driven by GONZALEZ. During the pre-primary inspection, the CBPO observed packages in one of the quarter panels and called-out over the radio "SDNET," which is an enforcement group that surreptitiously follows loaded vehicles from the POE in order to gain intelligence about associates and stash locations. The CBPO also notified the primary officer – BONILLO – and requested that the LaCrosse be sent to the secondary inspection area. GONZALEZ was only one car away from BONILLO's booth at the time the discovery was made. Notably, border records reflect that GONZALEZ was admitted *four* other times by BONILLO at the Otay Mesa POE – a statistically improbable number of crossings unless coordinated.

16.    In the secondary inspection area, a Z-Portal scan showed anomalies within the doors and rear quarter panels of the LaCrosse. A K-9 also alerted to the LaCrosse's trunk. GONZALEZ and the LaCrosse were then admitted into the United States after placement of a GPS tracker so that SDNET could follow it to its destination. Despite not being told that anything was amiss, GONZALEZ engaged in highly surveillance-cautious maneuvers after leaving the POE, including making sudden U-turns. GONZALEZ eventually parked the LaCrosse in a public parking area and then fled out of the back of a store after convincing a store manager he was in danger, leaving behind the LaCrosse. Investigators believe that BONILLO notified the DTO that SDNET would be following GONZALEZ.

---

RABIELA was pulled over by San Diego Sheriff's Deputies. Investigators then observed Gonzalez circle the location of the traffic stop several times before leaving the area.

6

17.     Indeed, the counter-surveillance continued. As investigators watched, a different individual arrived after several hours to the LaCrosse. She then drove it to a few locations, including trying to stay the evening at a hotel, before parking it on the street overnight. She returned the next day and drove it to a residence where it was taken into a garage. A search warrant was then obtained for the residence. Three males, later identified as Michael Morales, Cesar Meza (MEZA), and Armando Gallo ran from the garage towards the rear of the residence and were apprehended at an outside patio. Inside the residence, Jamie Rose Perez, who had driven the LaCrosse to the residence, and Sheila Torres (TORRES) also were apprehended. Notably, MEZA has three vehicle crossings through lanes manned by GARCIA, and one through a lane manned by BONILLO. Similarly, crossing records reflect that TORRES crossed through BONILLO's lane approximately 18 minutes after GONZALEZ entered the United States in the LaCrosse.

18.     A search of the LaCrosse resulted in the seizure of 41 packages of fentanyl powder weighing approximately 43.42 kilograms; 3 packages of fentanyl pills, weighing approximately 2.18 kilograms; and 1 package of heroin, weighing approximately 1.01 kilograms. The packages were found concealed inside, among others, the vehicle's quarter panels, left door panels, and right passenger door panel. An additional 24 packages of fentanyl powder and 11 packages of fentanyl pills also were found in two duffle bags inside the residence.

19.     Notably, after her arrest, TORRES was given the chance to make a call and stated that she wanted to call her cousin, who she identified as "Melissa." When the call was placed to the Mexican number of her supposed cousin, a male answered. Torres asked for Melissa, but the male seemed confused. This prompted Torres to exclaim, "Diego!" and state that she was in jail. The male then hung up. BONILLO's first name is "Diego."

**D.     Financial Records Reflect BONILLO's Involvement in the Drug Conspiracy**

20.     Records from CBP reflect that BONILLO, who had been employed by CBP since approximately April 2023, made approximately $64,722 per year in base salary plus

7

an additional average of $17,923 per year in overtime salary prior to his arrest. Bank records also reflect that he receives a nominal amount of money (between $500 to $700) from Veterans Affairs (VA) every month. Both his salary and his VA benefits are directly deposited into his bank account. Notably, at the time he was hired, BONILLO reported approximately $45,000 in debt.

21.     Investigators have conducted interviews separately with BONILLO's long-term girlfriend, and roommate and brother-in-law, Erick Monsalvo (MONSALVO). Both denied that BONILLO receives income from any sources other than outlined above, including through the buying and selling of vehicles. Evidence, including that outlined below, reflects that BONILLO has unexplained wealth which, based on training and experience, investigators are aware is indicative of involvement in drug trafficking.

**Unexplained Cash**

22.     A review of BONILLO's J.P. Morgan Chase credit card statements reflect that, between October 2023 and May 2024 (the timeframe of the conspiracy, as outlined above), BONILLO utilized cash to make eight payments toward his credit card balance and two deposits to his bank account (which occurred on the same date so are combined into one entry below). The average cash deposit was $2,067, although the amounts ranged from $1,000 to $4,000. Bank records reflect that this cash, which totaled $18,600 during that timeframe, had not been withdrawn from his bank account that received the direct deposits from CBP and the VA. Moreover, the deposits were all made on dates that BONILLO returned from Mexico, or the day(s) shortly thereafter, as reflected in the chart below. Based on training and experience, investigators are aware that it is common practice for narcotics traffickers to be paid in cash and for the cash to often be paid to them in Mexico.

| Travels from Mexico | US Bank & Credit Card Cash Payment Amount | US Bank & Credit Card Cash Payment Amount | |
|---|---|---|---|
| 10/25/2023 | 10/27/2023 | $ | 1,000 |
| 11/8/2023 | 11/8/2023 | $ | 1,200 |
| 11/25/2023 | 11/27/2023 | $ | 1,400 |
| 12/5/2023 | 12/5/2023 | $ | 2,000 |
| 12/20/2023 | 12/22/2023 | $ | 3,000 |
| 1/17/2024 | 1/17/2024 | $ | 2,000 |
| 2/27/2024 | 2/27/2024 | $ | 4,000 |
| 3/9/2024 | 3/9/2024 | $ | 1,000 |
| 3/25/2024 | 3/25/2024 | $ | 3,000 |
| Total US Bank & Credit Card Cash Amount | | $ | 18,600 |

**High-Priced Expenditures**

23.    BONILLO's financial records also reflect spending above his means. For example, in March 2024, BONILLO flew to Paris, France, where he stayed approximately one week abroad before returning to the United States. Similarly, in November 2023, it appeared he spent time abroad after traveling to/from Dublin, Ireland. Indeed, his credit card expenditures reflect that, between November 2023, and March 18, 2024, he utilized his credit card to make expenditures associated with: (1) Dublin, Ireland, (2) Amsterdam, Netherlands, (3) Luxembourg, (4) Cancun, Mexico, (5) Big Bear Lake, California, and (6) Paris, France. Travel expenses posted to BONILLO's account during this timeframe were approximately $13,091, as outlined in the chart below.[3] A Gucci purchase for $1,498 during the same timeframe also was recorded.

---

[3]    Interestingly, not all expected travel expenses were observed in BONILLO's travel records. For example, airfare and a "vacation getaway" expense for $99 to Cancun, Mexico was posted to his account in January 2024; however, lodging expenses were absent. Based on training and experience, investigators believe that it is likely that BONILLO was utilizing cash for these expenses, which is why they do not appear in his credit card statements.

24.     Notably, during this same timeframe, BONILLO made cash payments to his credit card in the amount of $13,400 and deposited $1,200 in cash into a bank amount, totaling $14,600. Given that BONILLO, as well as MONSALVO and his girlfriend, have denied any outside employment, investigators believe that the cash likely represents the proceeds of BONILLO's drug-trafficking activity. As stated above, based on training and experience, investigators are aware that drug trafficking is largely a cash business.

|  | 11/12/2023 to 11/18/2023 | 1/8/2024 | 02/13/2024 | 03/10/2024 to 03/18/2024 |
|---|---|---|---|---|
|  | Dublin, Ireland; Amsterdam, Netherlands | Cancun, Mexico | Big Bear Lake, CA | Paris, France & Luxembourg |
| Airfare | $          864 | $          950 | $            - | $       1,594 |
| Lodging | $       1,074 | $            - | $          440 | $          700 |
| Food/Other/Retail | $       1,235 |  | $            - | $          768 |
| Booking.com/Vacation Getaway | $          297 | $            99 | $            - |  |
| Entertainment | $            - | $            - | $          474 | $       4,596 |
|  | $       3,470 | $       1,049 | $          914 | $       7,658 |

25.     Data obtained from BONILLO's telephone also reflects high-dollar real estate interests. In December 2023 alone, BONILLO had contact with approximately 13 different Mexican realtors about purchasing property in Mexico. For example, on or about December 15, 2023, BONILLO exchanged several text messages with "Ambar Navarro" from "Amber Luxury Realty" about the purchase of property in the La Colonia Del Rio, a neighborhood located in Tijuana, Mexico. During the text conversation, BONILLO stated that he was looking to purchase an apartment through a combination of cash and financing. BONILLO also told Navarro that the two would discuss the possibility of cash when they met in person to view the property. Then, on January 5, 2024, BONILLO relayed that Navarro would receive a message from his "lawyer" and that they could then begin. It is unclear whether BONILLO went forward with the purchase, although the messages stopped in February 2024. Similarly, on or about December 20, 2023, BONILLO exchanged messages with "Gabriela Arteaga" about purchasing an investment property. During one text exchange, BONILLO asked if she could assist him with the purchase of "five beach apartments and 3 plots of land" that he had apparently located himself.

10

BONILLO also stated that his investment budget was "6 Million Pesos" (approximately equivalent to $349,000). The messages do not reflect whether the deal went through.

26.     BONILLO also appears to have ownership or interest in vehicles that are not registered to him, despite his girlfriend and MONSALVO specifically denying that BONILLO was involved in the buying and selling of vehicles. As stated above, investigators are aware, based on training and experience, that drug traffickers often seek to conceal their unexplained wealth by putting assets in the names of others. For example, on or about May 4, 2024, during a recorded jail call occurring shortly after his arrest, BONILLO instructed MONSALVO to contact "Albert" and have him get ahold of "Marco." BONILLO said to tell Albert that BONILLO has three cars with Marco and that, if MONSALVO needed money, Albert could help.

**E.      Seizing the Target Device**

27.     On or about the date BONILLO was arrested, BONILLO made a recorded jail call to MONSALVO. In the call, BONILLO instructed MONSALVO:

> *"If they want to search, only what's mine, like my room, not your room, or the garage. So, if they have a warrant, tell them which room is mine and that I am renting it out. It's not right they search the other rooms and the garage."*

28.     Based on my training and experience, I am aware that individuals in custody often attempt to relay covert messages because they are aware that their communications are monitored by law enforcement. Here, investigators believe that BONILLO was covertly instructing MONSALVO to conceal and/or impede investigators' ability to obtain additional evidence of his wrongdoing by encouraging MONSALVO to conceal such evidence in his own room and/or by stopping law enforcement from accessing common areas of the Target Residence, including MONSALVO's room or the garage.

29.     On July 23, 2024, a federal search warrant issued in the Southern District of California by U.S. Magistrate Judge Michael S. Berg authorized the search of the entire

11

1 | residential rental home of BONILLO located at 842 Caminito Estrella, Chula Vista,
2 | California (see 24-mj-02811-MSB).

3 |     30.    Two days later, on July 25, 2024, the FBI executed the search warrant.
4 | Pursuant to the search warrant, the FBI located and seized a box for a MacBook Air
5 | computer bearing serial number C1MTC3U3H3QD from BONILLO's bedroom. The FBI
6 | also located and seized a MacBook Air computer with the same serial number (**Target**
7 | **Device**) in MONSALVO's bedroom on the floor between a nightstand and the bed. When
8 | interviewed by FBI BCTF investigators, MONSALVO denied moving items including the
9 | **Target Device**, but admitted the **Target Device** belonged to "Diego".

10 |     31.    Based upon my training, experience, and consultations with law enforcement
11 | officers experienced in criminal investigations, I am aware that criminal actors, their co-
12 | conspirators, and others who aid them will often attempt to hide or destroy evidence which
13 | they believe can be used to show culpability in criminal activity. I am further aware that
14 | personal items, such as personal laptop computers are commonly stored in either personal
15 | spaces (such as the owner's bedroom) or in a home office environment. Of relevance, during
16 | the search of BONILLO's residence, a different personal laptop belonging to
17 | MONSALVO's wife (who is also BONILLO's sister) was observed by the FBI. That
18 | separate laptop was located in her personal space (specifically, her shared bedroom with
19 | MONSALVO) and not in the bedroom of a different occupant of the home (such as
20 | BONILLO's bedroom).

21 |     32.    Based on the totality of the circumstances described above, I believe that
22 | despite proffering to the contrary, MONSALVO did in-fact act on BONILLO's covert jail
23 | call instructions to move the **Target Device** from BONILLO's room to a portion of the
24 | residence BONILLO previously indicated that law enforcement officers would not be able
25 | to search. Based on my training and experience, I believe MONSALVO took this action in
26 | an attempt to interfere with the federal investigation into his brother-in-law.

27
28

33.     Furthermore, based upon my experience and training, consultation with other law enforcement officers experienced in criminal investigations, and all the facts and opinions set forth in this affidavit, I believe that information including but not limited to; browsing history, account records, photographs, financial records, passwords, evidence of connections to co-conspirators, and other content tending to show culpability for the charges for which BONILLO has been indicted will be found within the **Target Device**.

34.     Accordingly, I request permission to search the **Target Device** for data beginning on September 22, 2023 (one month prior to SERVIN's first crossing through BONILLO's lane), up to and including July 25, 2024 (the date the **Target Device** was seized by the FBI) because evidence exists showing MONSALVO or other individuals with access to the **Target Device** have already attempted to interfere with the investigation of BONILLO by moving it and may have further attempted to interfere by tampering with or attempting to destroy data stored on the **Target Device** after BONILLO's arrest. If authorized to search through July 25, 2024, investigators may be able to recover evidence of attempts to destroy evidence after BONILLO's arrest.

## METHODOLOGY

30.     With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, which may contain data subject to seizure pursuant to this warrant.

**Identification And Extraction of Relevant Data**

31.     A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are literally thousands of different hardware items and

software programs, and different versions of the same program, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

32.    Analyzing the contents of a computer or other electronic storage device, even without significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created, downloaded, or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Sometimes it is possible to recover and entire document that was never saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications do not store data searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other

events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computer or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting as the keyboard.

33.   It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies, and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars, and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

34.   Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has been mind-boggling. For example, as single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced paged of text. Computer

hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

35. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred and twenty (120) days from the date the warrant is signed, absent further application to this court.

36. Following the issuance of the warrant, I will collect the **Target Device** and subject them to analysis. All analysis, including forensic and manual review, of the data contained within the computer and its memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

37. There have been no prior attempts to obtain this evidence other than as stated above, except that on or about July 2, 2024, investigators obtained a search warrant for Apple iCloud data related to BONILLO's telephone number 619-942-0940 and email address manefire@hotmail.com, for data from September 22, 2023 to May 5, 2024. Investigators have not yet been able to review the materials provided by Apple in response to the search warrant.

38.     Investigators are unaware at this time whether the **Target Device** is associated with the same iCloud account. To the extent it is, investigators may obtain some duplicate data from a search of the **Target Device** if it is synced with the same iCloud account.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## CONCLUSION

39.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of BONILLO and others' violations of Title 21, United States Code, Sections 952, 960, and 963. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachments A, and seize the items listed in Attachment B as applicable, using the above-described methodology.


I swear the foregoing is true and correct to the best of my knowledge and belief.


_Sylvan Strohm_
_____
Special Agent Sylvan Strohm
Federal Bureau of Investigation


Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 7th day of August, 2024

Honorable Daniel E. Butcher
United States Magistrate Judge

18